Filed 8/31/22  P. v. Vigueras CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B302530 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA467075) |
| v. | |
| MANUEL VIGUERAS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed in part; reversed in part and remanded as to Vigueras, Delgado and Castro.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Vigueras.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant Aimee Castro.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant Bayron Randolfo Pineda.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant Sergio Delgado.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendants and appellants Manuel Vigueras, Aimee Castro, Bayron Randolfo Pineda, and Sergio Delgado appeal from the judgments entered after their joint trial.[1]  Each defendant contends that the trial court erred in imposing fees and assessments without first determining their ability to pay, and all defendants submit joinders in one another's arguments. Individually they contend:  Vigueras, that his convictions of robbery and felon in possession of a firearm were unsupported by substantial evidence, that the trial court abused its discretion in imposing the upper term for robbery, and that Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) requires remand for resentencing; Castro, that her criminal threat conviction was not supported by substantial evidence, and she is entitled to additional custody credits; Pineda, that he was prejudiced by prosecutorial misconduct during argument; and Delgado, that substantial evidence did not support his extortion conviction, that he was prejudiced by instructional error, and that the gang

---

[1]     We refer to the four appellants collectively as defendants and individually by each defendant's surname.

enhancement was unsupported by substantial evidence. Delgado also expressly joins in Pineda's claim of prosecutorial misconduct.

After defendants' appeals were filed, Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), amending Penal Code section 186.22 and adding section 1109, went into effect.[2] (Stats. 2021, ch. 699.) After the parties were given an opportunity to file supplemental briefs, Vigueras, Castro and Delgado filed briefs seeking reversal of the gang enhancements imposed pursuant to section 186.22. Vigueras and Castro additionally seek reversal of their convictions and remand for a new trial.

We order the correction of Castro's judgment, adding seven days of presentence custody credit, but find no merit to defendants' claims of error regarding the imposition of fees and assessments. We agree that the gang enhancements were unsupported by substantial evidence when considered under the recently amended section 186.22, and that Senate Bill 567 applies to Vigueras's sentence, but find no merit to defendants' remaining contentions. We thus affirm the judgments of conviction, but conditionally reverse the gang-related enhancements, vacate the sentences of Vigueras, Castro and Delgado, and remand the matter for a limited retrial based on statutory changes to section 186.22 due to Assembly Bill 333 and for resentencing Vigueras pursuant to section 1170 as amended by Senate Bill 567.

---

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

# BACKGROUND

## Charges and allegations

In an 11-count information, defendants were charged as follows:

Count 1, as to all defendants, attempted extortion from Jenny D. by means of threat, in violation of sections 664 and 518;

Count 2, as to Vigueras, Castro, and Delgado, criminal threats against Jenny D. in violation of section 422, subdivision (a);

Count 4,[3] as to Vigueras, Castro, and Delgado, second degree robbery of Jenny D. in violation of section 211;

Count 5, as to Vigueras, Castro, and Delgado, dissuading a witness, Jenny D., by means of force or threat in violation of section 136.1, subdivision (c)(1);

Count 6, as to Pineda and Delgado, extortion from Yenis H.,[4] by means of force and threat in violation of section 518;

Count 7, as to Pineda and Delgado, criminal threats against Yenis H. in violation of section 422, subdivision (a);

Count 8, as to Pineda, second degree robbery of Yenis H. in violation of section 211;

Count 9, as to Pineda, dissuading a witness, Yenis H. by means of force or threat in violation of section 136.1, subdivision (c)(1);

Count 10, as to Vigueras, possession of a firearm by a felon in violation of section 29800, subdivision (a)(1);

---

[3]     The information does not contain a count 3.

[4]     Yenis testified at trial that the initial of her last name was P.  After summarizing the information, we will refer to her last name as P.

4

Count 11, as to Pineda, possession of a controlled substance (methamphetamine) for sale in violation of Health and Safety Code section 11378; and

Count 12, alleged as to Pineda, possession of a controlled substance (cocaine) for sale in violation of Health and Safety Code section 11351.

In addition, pursuant to section 186.22, former subdivision (b), the information alleged as to counts 1, 2, 4, 5, 6, 7, 8 and 9 gang allegations. Other allegations as to counts 1, 2, 4 and 5 were as follows: Vigueras was out on bail on his own recognizance in case No. A462807; he had been convicted of a prior serious or violent felony, subjecting him to sentencing under section 667, subdivisions (a)(1), (b)-(j), and section 1170.12; and he had four prior prison terms, within the meaning of section 667, subdivision (b); and Castro had two prior prison terms, within the meaning of section 667, subdivision (b). Additional allegations regarding Delgado in counts 1, 2, 4, 5, 6 and 7 included that he had been convicted of a prior serious or violent felony, subjecting him to sentencing under section 667, subdivisions (a)(1), (b)-(j), and section 1170.12; and he had six prior prison terms, within the meaning of section 667, subdivision (b).

**Verdicts and sentencing**

*Vigueras*

Vigueras was found guilty of attempted extortion, second degree robbery, and felon in possession of firearm, and not guilty of criminal threat and dissuading a witness. The gang allegation pursuant to section 186.22, former subdivision (b)(1) was found true only as to count 1. On October 23, 2019, the trial court found true Vigueras's prior convictions and sentenced him to a total term of 13 years four months in prison. With count 4 as the

5

base term, the court imposed the high term of five years, doubled as a second strike, plus a consecutive term of six months as to count 1 (one-third the middle term of 18 months), doubled to one year, enhanced by one year (one-third the gang enhancement) pursuant to section 186.22, subdivision (b)(1)(A). The court also imposed eight months for unlawful possession of a firearm (one-third the middle term of 24 months), doubled to 16 months. The court struck the five-year enhancement allegation of section 667, subdivision (a)(1) and dismissed the prior prison term enhancements.

Vigueras filed a timely notice of appeal from the judgment.

### *Castro*

Castro was found guilty in counts 1, 2, 4 and 5 as charged and the gang allegation attached to each count was found true. On December 16, 2019, the trial court sentenced Castro to a term of eight years in prison, comprised of the high term of three years on count 2, plus a five-year gang enhancement pursuant to section 186.22, subdivision (b)(1)(B). The court imposed and stayed pursuant to section 654 the remaining terms and gang enhancements, and struck the prior prison term enhancements.

Castro filed a timely notice of appeal from the judgment.

### *Pineda*

Pineda was found guilty of criminal threat, second degree robbery, dissuading a witness, possession of methamphetamine, and possession of cocaine, but the gang allegations were not found true. He was also found not guilty of counts 1 and 6. On October 21, 2019, the trial court sentenced Pineda to five years in prison. The sentence was comprised of the middle term of three years on count 8 as the base term, plus a concurrent middle term of two years as to count 7, a consecutive term of one year (one-

6

third the middle term of three years) as to each of counts 9 and 12, and a concurrent middle term of two years as to count 11.

Pineda filed a timely notice of appeal.

### *Delgado*

Delgado was found guilty of attempted extortion, two counts of criminal threats, and extortion. The gang allegations pursuant to section 186.22, former subdivision (b)(1) were found true. Delgado admitted the prior convictions as alleged. Delgado was found not guilty of counts 4 and 5. On February 28, 2020, the trial court sentenced him to a total term of 19 years in prison. The court imposed the high term of three years for count 2, the base term, doubled to six years as a second strike, plus five years for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(B), a concurrent middle term of 18 months as to count 1, and a concurrent term of three years as to count 6. Pursuant to section 654, the court stayed the gang enhancement alleged under section 186.22, subdivision (b)(1)(C). On count 7, the court imposed a consecutive term of eight months, one-third the middle term of 24 months, doubled to 16 months as a second strike, plus 20 months, one-third the five-year term provided by section 186.22, subdivision (b)(1)(B). Pursuant to section 667, subdivision (a)(1) the court imposed an additional five years to Delgado's sentence.

We deemed Delgado's notice of appeal, filed July 6, 2020, to have been timely filed.

### Prosecution evidence

#### *Jenny D.'s testimony (counts 1, 2, 4, 5)*

Jenny D. testified that prior to April 1, 2018, she had worked at the Rodeo Room bar as a "fichera," a woman who drinks with men at the bar, for about one year. She identified

7

Delgado (Risky) and Pineda (Brian) in court as men who frequented the bar. She mostly saw Delgado standing by the door to the smoking patio, drinking water or cranberry juice and looking around. She never saw him interact with the waitresses, bartenders, managers, security guard, or two cashiers who worked at the bar. Once when Jenny asked about his tattoos Delgado told her they represented a gang called "Playboys," which made her somewhat fearful, but since he had not done anything to her, she had no reason to be afraid.

Though he was always there when she was, Jenny denied that she and Pineda were friends. Rather she just saw him there, playing billiards or selling drugs. She always saw Delgado and Pineda at the bar together when she was there. They would talk and leave together. In the back where people smoked, Jenny often saw some people give Pineda money, and he would give them a little bag. Pineda also charged people for rides. He twice gave her a ride home and thus knew her address.

On April 1, 2018, around 9:00 p.m. Jenny was drinking with a man at the Rodeo Room, when another man approached her saying Delgado wanted to talk to her in the patio. A surveillance video of the interaction was played for the jury and Jenny narrated the action, which showed the man telling her to go see Delgado. Two people then come into view, who Jenny identified as Vigueras and Castro. Pineda is seen handing pool sticks to the man before Jenny gets up and goes through the patio door.

When Jenny got to the patio and Vigueras and Castro were there, Jenny asked Delgado what was going on. Castro then placed herself in front of Jenny, said that Vigueras was her husband and that Pineda and Delgado said Jenny was selling

8

drugs at the bar. Jenny denied selling drugs and told Castro she was working there and had three children to support. Castro replied, "Yes, you do sell drugs here. And if you're going to sell drugs, you have to make a donation [of] $50 every week." Jenny continued to deny selling drugs and refused to pay Castro any money. As Vigueras stepped aside, Castro told Jenny, "You know who we are," that they were from the Playboys gang, and she was going to kill Jenny if she did not give them money, since Jenny could not be selling drugs there without Castro's permission. When Jenny refused, Castro said, "I don't want to see your fuckin' face here again." Vigueras returned, Castro hit Jenny and immediately after that, Vigueras punched Jenny on the side of her head next to her forehead.

Jenny ran back inside and tried to dial 911 as Castro and Vigueras came up behind her. Castro grabbed the phone and said, "Oh, you call the police? That's the last thing you're gonna do." Though Jenny tried to get it back, Castro gave the phone to Vigueras, and then they left the bar. After Castro and Vigueras left the bar with her phone, Delgado also left. She did not see Pineda, who had not threatened her, leave. After they left, Jenny unsuccessfully tried to call the police. Jenny was worried they might harm her children, so she quickly took a taxi home to check on them. She then went to the police station, where she spoke to a female officer who did not speak Spanish. About a month later a detective gave Jenny her phone back.

Because Jenny interpreted "[t]hat's the last thing you're gonna do" as a death threat and had been hit, she was afraid. She was also afraid while testifying. Because they knew where she lived and she was afraid that they could come back and hurt her or her children, she moved.

### *Yenis P.'s testimony (counts 6, 7, 8, and 9)*

Yenis testified that she was a waitress at the Rodeo Bar and worked five days per week. She identified Pineda and Delgado, whom she met there, and knew as Brian and Risky, respectively. The men were there together every time she was there, but they were not customers, rather they sold drugs there. Yenis testified that she dressed somewhat formally, and at first both Pineda and Delgado seemed to think she was a detective by saying things like, "What are you doing here? You look like you're infiltrating, like you're a police officer." Eventually, they stopped and tried to make friends with her.

Yenis tried to keep Delgado at a distance because of his drug dealing. Delgado told her he was a member of the Playboy gang and that he had previously been in jail. She knew that Pineda was also a member of the gang. Pineda would follow her, call her on the phone and look her up through social media. Yenis had an affair with Pineda and went to a hotel room with him about three times. Then Yenis decided not to see Pineda again since he was married. When she told him, he said they could still see each other and was upset. He then acted jealously and continuously bothered her.

On March 6, 2018, while Yenis was working at the bar, Pineda and Delgado were there selling drugs and seemed angry. Sometime during the evening, Pineda told her that he knew where she lived and where her kids stayed. Delgado told her that everyone there was paying a quota, and she had to give him money for "rent." She understood that he meant she was required to pay him to work at the Rodeo Room because the Playboys gang was in charge of the place. Yenis did not want to pay him, but gave him $90 or $92 because she knew "[t]hey were

10

the ones who were bossing around there," and she was afraid to refuse.

Yenis left the bar about 2:00 a.m. and went home. About 2:45 a.m. she heard a knock at her door, looked out the window, and saw Pineda. He appeared angry and told her to open the door, which she did with her phone in her hand, prepared to call the police. Pineda snatched the phone from her hand as she dialed 911. He held it as she struggled to take it back. Pineda scratched Yenis on her left wrist, slapped her left lower cheek and jaw area, and punched her in the stomach. He pulled a knife with a gray handle from his pocket, showed it to her, took her by the hands and hair while holding the knife, and forced her to his car, where he put her in the front passenger seat and fastened the seat belt. Delgado was seated in the back seat behind her.

After the car was moving and the two men said they were going to kill her because she was a "whore," a "bitch," and a "buttinsky," Yenis tried to remove the seatbelt and throw herself out of the car. They discussed whether to cut her throat, dump her in some alley, or tell Delgado's girlfriend Christina to beat her up. Yenis feared for her life. She had met Christina at the Rodeo Room. Christina would solicit women, including Yenis, to work as prostitutes. When Yenis refused, she became angry and developed a hatred for Yenis. Pineda and Delgado tried calling Christina but were unable to reach her. Pineda continued to drive around for about two hours as Yenis begged them to let her go and promised not to say anything. They told her that if she talked, they would find her. Pineda hit her and held the knife in his right hand or in his lap with the blade turned toward her. He held the wheel with one hand and would punch her with the other. Sometimes he let go of the wheel to punch her with both

hands. Once during the ordeal, he tried to throw her out of the car while travelling about 90 miles per hour. Eventually they released her. Pineda told her if she filed a police report, they would get out, look for her, and make her pay for what she had done. She did not report the incident right away.

Later that morning Yenis took her children to school. Pineda followed her with her phone in his hand and offered to return it to her. Very frightened, Yenis ran into the school with her children and spoke to a teacher who advised her to report this to the police. Yenis then went to the police station to make a report, but was too afraid to tell them all that had happened the night before. Yenis never returned to work at the Rodeo room after that night.

Yenis testified that Pineda's knife had gray tape on it and looked homemade. She identified her phone and a photograph of the knife in court. She had not seen her phone since Pineda tried to return it to her at her children's school.

### The investigation

Los Angeles police gang detective Samuel Arnold, the investigating detective in this case, testified that he obtained surveillance video from cameras located outside the bar. The video, which showed Castro and Vigueras, was played for the jury.

Detective Arnold also identified for the jury photographs he had taken inside the residence shared by Castro and Vigueras pursuant to a search warrant, specifically an image of a Playboy Bunny and the letter "P," and the words "China" and "Pelon" with

12

a heart between them, written on the wall.[5] Photographs were also taken of a cabinet with "KILLO" and "NR" written on it next to "Rabbit (Gang)," and a photograph of the phone found in the residence, which Jenny identified as being hers.

Detective Arnold also searched two vehicles in the driveway, a black Dodge Charger and a Nissan SUV. Hidden under the passenger glove box in the Charger, he found a nine-millimeter black pistol with a brown grip, which appeared to be operable. When the Nissan SUV was searched, he found a BB gun in the middle console.

Jenny gave Detective Arnold the license plate number of Pineda's SUV. While observing the SUV parked in front of the Rodeo Room, detectives saw Pineda walk out of the bar, converse with a person on the sidewalk, rummage in the rear of the SUV, hand the person something, and then drive away. He was stopped by patrol officers, made to lie down, was handcuffed, and a large knife was removed from his waistband. A search of the SUV turned up several bindles of what appeared to be methamphetamine and cocaine. A scale was also found.

Detective Arnold interviewed Castro at the Los Angeles Police Department (LAPD) jail on the night of April 16 to 17. The recorded interview was played for the jury. Castro denied ever having been to the Rodeo Room bar until Detective Arnold showed her photographs taken from video showing her inside the bar on April 1, 2018. She then identified herself and said, "I must have been really doped up." Castro admitted she was associated with the Playboys gang. When asked about the phone

---

[5] "China" was Castro's nickname and "Pelon" was Vigueras's "street name."

that had been found during the search of her home, she said it belonged to "[s]ome girl I had a little argument with because she wanted to sell me some dope that day, and I didn't want no dope that day." Castro claimed that she told the girl to leave her alone because she was already high, and the girl then started to call the police. Castro admitted that she "snatched" the phone and left.

Detective Arnold also conducted a recorded interview with Vigueras at the LAPD jail on April 16, 2018, which was also played for the jury. Vigueras identified himself in a photograph Detective Arnold showed him of Vigueras standing in the parking lot just south of the Rodeo Room. Vigueras admitted he was a member of the Playboys gang and that his street name was Pelon.

Detective Arnold interviewed Delgado on April 19, 2018, at which time Delgado told Detective Arnold that he did not "work there [(the Rodeo Room)], but technically, if a fight breaks out or something, I'm the one who goes and breaks it all up . . . ." Delgado said that he had been there for years, everyone knew him, and that he was "something like" security. He went there every day and stayed until 2:00 a.m. to make sure things ran smoothly, that no one was robbed, "and all that stuff." Delgado admitted having Playboys gang tattoos, that he belonged to the Dukes clique of the Playboys, and was called Risky. Delgado said the Rodeo Room was not in Playboys' territory, but belonged to other gangs whose members went there and with whom the Playboys had no problem.

Detective Arnold also conducted a recorded interview of Pineda, who said he had been giving rides for money from the Rodeo Room for approximately eight years. He denied taking

14

Yenis's phone or knowing about any drugs found in his car. Pineda admitted having gone to Yenis's children's school but said he just wanted to talk to her.

### *Gang evidence*

Officer Samuel Gil, the prosecution's gang expert, testified that he had participated in hundreds of gang investigations and about 10 percent of them involved the Playboys gang. He testified that gangs establish territory in order to safely conduct illicit activity ranging from narcotics sales, transportation of firearms and street robberies. Officer Gil explained that gang members conduct criminal activities such as extortions in order to earn money not only for themselves, but also for the gang so that narcotics or firearms may be purchased in order to continue to commit other crimes and earn more money. Gangs tend to commit crimes in their own territory in order to lessen the probability of being attacked or "taxed" by another gang for conducting elicit activity in its territory. The territory of the Playboys gang is a fairly large area of south central Los Angeles.

Officer Gil testified that the primary activities of the Playboys gang are assaults, robberies, shootings, extortion, and shootouts with police officers. The prosecution also presented evidence of predicate offenses by Playboys gang members in the form of certified court dockets showing the convictions of Gerardo Calindres and Felipe Burgos. Officer Gil was acquainted with both men and knew them to be Playboys gang members. One record showed that Calindres was convicted on August 9, 2017, of assault by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(4), a felony, committed on April 11, 2017. The other record showed that Burgos was

convicted on August 25, 2016, of attempted extortion in violation of section 524, committed on or about July 25, 2015.

Officer Gil identified Castro and Vigueras in court, whose monikers he knew to be China and Boxer. He had spoken with both of them previously and knew they both have Playboys-related tattoos. Officer Gil said Vigueras's residence is a known Playboys hangout, and he was of the opinion that they both were Playboys gang members.

Given hypothetical questions mirroring the facts in evidence, Officer Gil opined that the acts described were committed for the benefit of a criminal street gang, at the direction of the gang, and in association with another gang member. He explained that in his experience, extortion by gang members serves to create revenue for the gang, which is used to buy narcotics or firearms or to support gang members without jobs. He also explained that taking a victim's phone while she tried to call 911 would benefit the gang by preventing the victim from calling for help. In addition, intimidating and threatening the "ficheras" benefits the gang by instilling fear so that they will continue to pay the gang members to work at the bar.

**Defense evidence: Vigueras's testimony**

### *Direct examination*

Vigueras admitted he had been convicted in 2012 of robbery and in 2010 of receiving stolen property. He remembered going to the Rodeo Room on the evening of April 1, 2018, to look for his friend, Delgado, and claimed that he had been inside the bar just once before. He and his wife (Castro) went there to both give Delgado a ride and to pick up the chain that Delgado had taken from her. Castro was upset about the chain. As they walked in, Vigueras recognized Jenny, one of the women who worked there.

He did not see Delgado, so they walked to the back of the bar and saw Pineda. While Castro was asking where Delgado was, Vigueras went to the parking lot, where he asked a man standing near the door to go tell Jenny he wanted to speak to her. When Jenny appeared, Vigueras began to ask whether she had seen Delgado. Vigueras then saw Delgado coming down the stairs of the next door apartment shouting, "Hey, hey, what are you doing talking to that, you know, female?" Castro, who was high, having used drugs that evening, came outside and confronted both Vigueras and Jenny for talking to each other. All of them began arguing in Spanish. When they shoved each other, Vigueras separated them, and Jenny returned to the bar. Vigueras and Castro followed, and Castro said some last things to Jenny before they left the bar. Vigueras denied seeing Castro take Jenny's phone, but did see Castro with it later. He denied ever having the phone himself.

### Cross-examination

Vigueras admitted he owned a black Charger on April 1, 2018, and his wife owned a white Nissan Pathfinder around that time. Shown a photograph of the gun found in the Charger, Vigueras denied ever before seeing the gun and that it was the gun found in his Charger.

Vigueras did not recall telling Detective Arnold that he had never been to the Rodeo Room, and he did not remember having heard himself say that on the recorded interview played in open court. Vigueras explained that he had been there more than once but had gone inside only once before the incident, and it was from that one time he knew Jenny. Vigueras acknowledged having asked her to come outside that night because he believed she

17

would know Delgado's location, even though he did not know that she knew Delgado.

Vigueras testified that he was called Pelon by friends, family and his fellow gang members. He claimed his friend "Blaks" wrote the names China and Pelon and admitted he was there at the time. Vigueras testified that he had known Delgado for a long time and that they were more than good friends. Vigueras grew up on the next block from the bar in Playboys' territory and claimed the area of the bar was contested, so he could not say it was Playboys' territory. He claimed writing "PBS" in the bar did not mark it as Playboys' territory, explaining, "[I]t's just representing [the] gang." Vigueras "believed" Delgado was a member of the Playboys, but claimed that Castro was not, but she thought she was.

When shown a photograph of Jenny's phone, Vigueras denied knowing whether it was the phone Castro took from Jenny and then handed to him, that he ever had that phone in his hand, or that he knew where it had been found. He claimed that although the subject night was just the second time he had been in Rodeo Room, he went straight to the back of the bar expecting to find Delgado there. He explained his expectation was because Delgado had called him from someone else's phone, and Vigueras did not recognize the number. He acknowledged seeing Pineda, who would drive Delgado, in the back of the bar.

Vigueras claimed that on April 1 he was high on methadone and had taken Xanax bars. He claimed that Castro had smoked "weed," taken Xanax bars and had been drinking. Although Castro was high and he thought not in a condition to drive, she drove, not poorly, that night. Vigueras acknowledged

18

that the video showed them leaving the bar, walking normally, and Castro was running without a problem.

Vigueras denied he remembered telling Detective Arnold that he did not witness any kind of altercation between Castro and Jenny, explaining that he did not remember telling him anything at all. Vigueras acknowledged never having seen Jenny sell drugs and had no belief she was a drug dealer. She did not try to sell him drugs, and no one talked about drugs during the incident of April 1. Castro told him that Jenny tried to sell her drugs, but it was in his "peripheral hearing" and Vigueras "really didn't hear it." Vigueras acknowledged that he did not tell Detective Arnold anything about an argument between Castro and Jenny.

## DISCUSSION[6]

### I.     Vigueras's appeal

#### A.     *Substantial evidence of robbery*

Vigueras contends that his robbery conviction was not supported by substantial evidence. In particular, he argues that Jenny's testimony that Castro handed him the phone was not credible, and there was insufficient evidence to show he knew Castro was going to take the phone.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must

---

[6]     We discuss each defendant's individual issues first, after which we discuss the ability-to-pay issue, and then gang enhancements and Assembly Bill 333.

presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### 1. *Jenny's credibility*

The bar surveillance video shows the struggle over Jenny's phone, but there is no video showing Castro handing the phone to Vigueras. While the People do not claim that the handoff is visible in the video, they counter that Vigueras has not pointed to any part of the video that would exculpate him. Even though the handoff of the phone is not visible in the video, the jury was entitled to believe Jenny.[7] Vigueras acknowledges that a single witness is sufficient proof of a fact, but suggests an additional (apparently implied) exception to Evidence Code section 411,

---

[7]    Evidence Code section 411 provides: "Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."

20

citing *People v. Reyes* (1974) 12 Cal.3d 486, 499: "[W]here the testimony of a single witness is contradicted by other more substantial evidence, it may be considered insubstantial, and will not support a conviction." We find nothing in the cited case that would allow us to override the jury's credibility determination based upon evidence we find "more substantial" than other substantial evidence. We do not reweigh the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The testimony of a single witness is sufficient to support a conviction, so long as the testimony is not physically impossible or inherently improbable. (*Ibid*.)[8]

Vigueras does not show Jenny's testimony was physically impossible, but instead argues improbability. Vigueras notes the bar surveillance video shows that 41 seconds elapsed between the time Jenny picked up her phone to call 911 and the time that he and Castro were seen at the front door about to leave. He argues that it is inherently improbable that those events could occur in just 41 seconds, because the prosecutor referred to Jenny's struggle with Castro as "extended" and "not fast." Vigueras thus *infers* that Jenny's testimony is inherently improbable. However, testimony is inherently improbable only if its ""falsity [is] apparent without resorting to inferences or deductions.

---

[8] Additionally, the facts of *People v. Reyes* are distinguishable. There, three disinterested witnesses gave a description of the defendant as a participant, while one alibi witness who was not wearing his needed glasses testified that he saw defendant in a crowded bar, although he had never seen him before and had three seconds to observe him, making such testimony clearly less substantial. (See *People v. Reyes, supra*, 12 Cal.3d at p. 499.)

[Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"'" (*People v. Mayberry* (1975) 15 Cal.3d 143, 150; see *Davis v. Judson* (1910) 159 Cal. 121, 128, quoted by Vigueras.) Vigueras's argument is based only on his suspicion that 41 seconds was insufficient time for Jenny to pick up her phone, dial 911, struggle with Castro, who grabbed the phone, and for Delgado to tell Jenny, "I warned you. And the next time we're not going to be so friendly with you." However the prosecutor characterized the struggle, Vigueras has failed to demonstrate its impossibility or inherent improbability. We thus reject Vigueras's invitation to disbelieve Jenny's testimony.

### 2. *Aiding and abetting*

Vigueras also contends that insufficient evidence supports his conviction of robbery on an aiding and abetting theory because he could not possibly have known that Castro intended to take Jenny's cell phone *prior to the taking*.

One aids and abets the commission of a crime when he, acting with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, by act or advice, aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) For aiding and abetting liability to attach, the intent to aid and abet must be formed prior to *or during* commission of the offense. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1164-1165 (*Cooper*).) For purposes of robbery, "a taking is not over at the moment of caption; it continues through asportation." (*People v. Gomez*

(2008) 43 Cal.4th 249, 256.) "Although, for purposes of establishing guilt, the asportation requirement is initially *satisfied* by evidence of slight movement [citation], asportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety. Therefore, . . . for conviction of . . . aiding and abetting a robbery, a getaway driver must form the intent to facilitate or encourage commission of the robbery *prior to or during the carrying away of the loot to a place of temporary safety*." (*Cooper, supra*, at p. 1165, fns. omitted.)

Vigueras is no different from the getaway driver in *Cooper*. Jenny testified that Castro handed the phone to Vigueras, and we have rejected Vigueras's challenge to that testimony. Thus, by leaving with Castro, Delgado, *and the phone* shortly after Delgado warned Jenny they would not be so friendly next time, Vigueras facilitated the commission of the robbery "during the carrying away of the loot to a place of temporary safety." (*People v. Cooper, supra*, 53 Cal.3d at p. 1165, italics omitted.) As there is no merit to Vigueras's claim that he could not be convicted as an aider and abettor because he did not know or intend that Castro take Jenny's phone prior to the taking, we reject this substantial evidence challenge as well.

### B. *Felon in possession of a firearm*

Vigueras challenges the evidence supporting his conviction of felon in possession of a firearm. No one who has been convicted of a felony may lawfully own, purchase, receive, possess or have custody or control of any firearm. (§ 29800.) The possession, custody, or control of the firearm must be with the defendants' knowledge. (*People v. Snyder* (1982) 32 Cal.3d 590, 592 [analyzing former § 12021, subd. (a)(1), the predecessor

23

statute to § 29800].) "Possession may be physical or constructive, and more than one person may possess the same contraband. [Citation.] Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

Vigueras asserts that the evidence was insufficient to prove he had knowledge of the firearm's existence. He argues that although he owned the black Charger that was parked in his driveway, he was not in the car when police found the firearm inside the car, and no evidence was presented regarding when he had been in the car. A DNA test of the firearm was inconclusive, and when shown a photograph of the gun found, Vigueras denied having ever seen it before.

Vigueras relies on several cases where the defendant denied knowledge of the firearm and the evidence was nevertheless found to be sufficient to support the conviction. (See *People v. Neese* (1969) 272 Cal.App.2d 235, 246-247 [custody or control issue, not knowledge]; *People v. Nieto* (1966) 247 Cal.App.2d 364, 368 [guns found under front seat of the defendant's car when he had been driving it]; *People v. Hunt* (1963) 221 Cal.App.2d 224, 225 [gun found in car owned and being driven by the defendant]; *People v. Pearson* (1957) 150 Cal.App.2d 811, 817-818 [gun found in pocket of the defendant's overcoat when he put it on to go with police].) The cited cases merely show that there was sufficient evidence in *those* cases, not that proof here is insufficient without the particular facts of the cited cases. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case

necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

The defendant's awareness of the presence of a gun in his car may be proved by circumstantial evidence. (*People v. Hunt, supra*, 221 Cal.App.2d at p. 227.) A jury is free to disbelieve a defendant's denial that he was aware of the presence of a firearm. (*People v. Miranda, supra*, 192 Cal.App.4th at p. 411.) Here, Vigueras did not testify that he was unaware of the gun in his car. Rather, he claimed he had just bought the car and did not contend that he had not driven it or that he had not been in the car. When shown a photograph of the gun found in Charger, Vigueras merely denied ever seeing that gun before or knowing that the gun in the photograph was the one found in his Charger.[9] Moreover, the jury was not required to believe Vigueras. (See *People v. Miranda, supra*, at p. 411.)

"[T]he judgment is not subject to reversal on appeal simply because the prosecution relied heavily on circumstantial evidence and because conflicting inferences on matters bearing on guilt could be drawn at trial. Although the jury is required to acquit a criminal defendant if it finds the evidence susceptible of two reasonable interpretations, one of which favors guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.) Here, sufficient circumstantial evidence supported a reasonable inference that Vigueras was aware of the gun's presence. The car belonged to him and was parked in his driveway. Detective Arnold testified

---

[9] The recorded interview of Vigueras at the LAPD jail on April 16, 2018, was played for the jury. In it Vigueras said he had just bought the black Charger.

that when he searched the Charger it was apparent to him that the carpet beneath the glove box had been tampered with, so he looked under it and found the gun. The jury evidently found the tampered carpet would have been apparent to Vigueras as well, whenever it was that he bought the car. We conclude that substantial evidence supported Vigueras's conviction of felon in possession of a firearm.

### C. *Discretion to impose upper term*

Vigueras contends the trial court's imposition of the upper term for robbery was an abuse of discretion because the court relied on his criminal record while recognizing he played a minor role in the robbery.

Vigueras concedes that he made no objection, and, without an objection, a defendant fails to preserve for review "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (*People v. Scott* (1994) 9 Cal.4th 331, 353.)

Vigueras argues that the issue was preserved for appeal based on his sentencing brief, which cited the circumstance in mitigation set forth in rule 4.423(a)(1) of California Rules of Court that "[t]he defendant was a passive participant or played a minor role in the crime" and by listing several facts supporting that factor.[10] The People note Vigueras's sentencing brief did not

---

[10] Vigueras cites *People v. Partida* (2005) 37 Cal.4th 428, 437. We find no support for defendant's preservation argument in that

26

address whether an upper term may be based on a defendant's criminal record or whether the suggested factors in mitigation necessarily outweighed other factors.

In the event we find forfeiture, Vigueras asserts ineffective assistance of counsel and asks that we reach the merits. "'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in "qualitative as well as quantitative terms" [citation] . . . . We must affirm unless there is a clear showing the sentence choice was arbitrary or irrational.'" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) "Only a single aggravating factor is required to impose the upper term . . . ." (*People v. Osband* (1996) 13 Cal.4th 622, 728, citations omitted; see *People v. Myles* (2012) 53 Cal.4th 1181, 1221.) Here, the trial court selected the high term due to defendant's record of both violent and nonviolent felonies, which it found to be a significant factor in aggravation that outweighed any factors in mitigation, "including the defendant's minor role in these offenses, or relatively minor role in these offenses."

Partially quoting and paraphrasing language in *People v. Black* (2007) 41 Cal.4th 799, 817 (*Black*), Vigueras argues (in his words): "An aggravating circumstance *must* be one that makes the offense '*distinctly* worse than the ordinary' and makes the defendant deserving of punishment more severe than that merited for other offenders in the same category." (Italics added.)

_____

case. There, the California Supreme Court held that an objection to evidence without a separate due process objection is sufficient to preserve a federal due process claim where the due process claim is merely "an additional legal consequence of the asserted [state] error." (*Id*. at pp. 437-438.)

27

The actual quote in *Black* is: "An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.'" (*People v. Black*, *supra*, at p. 817, quoting *People v. Moreno* (1982) 128 Cal.App.3d 103, 110; see *People v. Hicks* (2017) 17 Cal.App.5th 496, 512.) It is apparent that the quoted language did no more than define aggravating factor.

Nevertheless, Vigueras appears to misinterpret the *Black* quote as requiring any relied-upon criminal history as an aggravating factor to be "distinctively worse than the ordinary" aggravating factor. He does this presumably because his criminal history includes one prior violent felony and six nonviolent felonies, making his record not distinctively worse than an ordinary criminal history, and thus the trial court abused its discretion by relying on his record. In addition Vigueras appears to interpret *Black*'s language to mean that aggravating circumstances must be derived from the particular facts of the current offense, rather than his own criminal history. Vigueras concludes that the imposition of the upper term required a "circumstance [that] made this robbery distinctively worse than the ordinary robbery." *Black* does not support either interpretation.

Vigueras refers to the trial court's language concerning how his criminal record outweighed any factors in mitigation, "including the defendant's minor role in these offenses, or relatively minor role in these offenses," as indicating that the court relied on an unrelated fact from a different count in this case as an aggravating factor. For this he relies on *People v. Searle* (1989) 213 Cal.App.3d 1091, 1097, which held that facts pertaining to only one count cannot be used as an aggravating factor to support an upper term on a different count unrelated to

28

those facts.  The court's reference to "these offenses" was not directed to an aggravating fact in another count; rather the court was explaining that Vigueras's criminal history outweighed the *mitigating factor* of Vigueras's relatively minor role in the crimes committed at the Rodeo Room.  *Searle* contains no language barring the use of a fact from another count as a *mitigating* factor or barring the use of a defendant's criminal history as an aggravating factor.

Finally, Vigueras urges that we reverse his sentence based upon the policy expressed in section 1170, subdivision (a)(1)[11]: "The . . . purpose of sentencing is public safety achieved through punishment, rehabilitation, and restorative justice.  When a sentence includes incarceration, this purpose is best served by terms that are proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances."  Vigueras also cites policy considerations of recent changes in other sentencing laws, arguing in essence that the current trend in sentencing law bars the trial court from relying on Vigueras's criminal history as an aggravating factor.

The trial court is permitted to rely on the factors that reasonably relate to the defendant.  (Cal. Rules of Court, rule 4.421(c).)  Vigueras cites no authority that a sentencing court exercises its discretion in an arbitrary or irrational manner unless the court makes a sentencing decision based on his review of the legislative history of various new sentencing laws, particularly when it has not been asked to do so.  Furthermore,

---

[11]     For a discussion of the current version of section 1170 as amended by Senate Bill 567, see part I.D. below.

Vigueras cites no authority suggesting his attorney provided ineffective assistance of counsel by failing to provide a dissertation on the policy and history of sentencing laws. Finally, Vigueras provides no authority for this court to judicially legislate by analyzing policy trends in sentencing. Vigueras has failed to demonstrate that the trial court's sentence choice was arbitrary or irrational, and he has thus failed to establish an abuse of discretion.

### D. *Senate Bill No. 567*

In a supplemental brief Vigueras seeks resentencing under section 1170, subdivision (b) as amended by Senate Bill 567.[12]

Senate Bill 567 became law on October 8, 2021, effective January 1, 2022. The legislation amended the determinate sentencing law, which affects the trial court's discretion and authority to impose one of three statutory terms of imprisonment, known as the lower, middle, and upper terms.

Section 1170, subdivision (b)(1) now provides:

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."

Section 1170, subdivision (b)(2) provides in relevant part:

"The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term,

---

[12] Vigueras refers to this legislation as "AB 567." Although Vigueras may have meant Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5.3), which was enacted the same day as Senate Bill 567, we assume he meant Senate Bill 567.

and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

In sentencing Vigueras to the high term, the trial court relied upon a consideration of Vigueras's record, including both violent and nonviolent felony convictions. Vigueras claims his case should be remanded for resentencing because the facts supporting the upper term were not found by a jury or admitted by him. In making this claim Vigueras disregards the very next paragraph of the amended statute, section 1170, subdivision (b)(3), which provides an *exception* to subdivision (b)(2). The court is allowed to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Vigueras admitted at least one of the relied-upon felony convictions: a prior robbery conviction. Vigueras makes no claim of lack of certified record of his other prior convictions before the court. He did not seek to augment the record when he filed his supplemental brief, nor did he attempt to provide a settled statement. Indeed, Vigueras has not acknowledged the section 1170, subdivision (b)(3) exception at all. We need not address claims not made, or make arguments for parties. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

We note that Senate Bill 567 applies retroactively (*People v. Garcia* (2022) 76 Cal.App.5th 887, 902), and we will reverse Vigueras's sentence on other grounds as discussed within. If Vigueras raises this issue on remand, the prosecutor will have the opportunity to provide a certified copy of Vigueras's California Law Enforcement Telecommunications System record,

31

a certified copy of a section 969b packet from the Department of Corrections and Rehabilitation, or other certified record of Vigueras's prior convictions.  (*Garcia*, at p. 902, citing *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 and *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## II.    Castro's appeal

### A.    *Substantial evidence of criminal threat*

Castro contends that her conviction of criminal threat was unsupported by substantial evidence.

"To establish a criminal threat, the prosecution must prove: (1) the defendant willfully threatened death or great bodily injury to another person; (2) the threat was made with the specific intent that it be taken as a threat, regardless of the defendant's intent to carry it out; (3) the threat was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution'; (4) the threat caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'; and (5) this fear was reasonable under the circumstances.  (§ 422, subd. (a); see *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)"  (*People v. Turner* (2020) 10 Cal.5th 786, 826.)

The prosecution identified the following threat made by Castro to Jenny:  "Oh, you call the police?  That's the last thing you're gonna do."  Castro contends this statement cannot constitute a criminal threat because it did not contain a threat to commit a crime that would result in death or great bodily injury, nor was the statement specific or clear enough to convey an intention to do so.  "'[Section 422] does not concentrate on the

32

precise words of the threat.  Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat.  These impressions are as surely conveyed to a victim when the threatened harm is conditioned on an occurrence guaranteed to happen as when the threat is absolutely unconditional.'"  (*People v. Wilson* (2010) 186 Cal.App.4th 789, 807.)  Furthermore, the specific intent required by section 422 is not an intent to actually carry out the threatened crime, but an intent that the victim receive and understand the threat.  "'"A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution [since] section 422 does not require those details to be expressed."'"  (*Wilson*, at p. 807.)  When the words of a threat are equivocal, ambiguous, or conditional, the intent that the words be taken as a threat must be determined from all the surrounding circumstances and not just on the words alone.  (*People v. Butler* (2000) 85 Cal.App.4th 745, 753-755.)

The surrounding circumstances cited by Castro are that she made the statement immediately before grabbing the phone from Jenny who was calling the police, and although the two women fought over the phone by pushing each other, Jenny was not harmed.  Soon thereafter Castro gave the phone to Vigueras and left the bar.  Castro argues "[t]hese are not the actions of someone threatening death or great bodily injury" and adds such circumstances give rise to just one interpretation: that Castro "was not going to let Jenny call the police because she was going to take her phone, not because she was going to kill her or inflict great bodily injury."

Castro's argument fails to consider all the surrounding circumstances. Jenny testified that she heard Castro's words as a death threat because the words were accompanied by being hit following the events on the patio. When Jenny refused to pay $50 per week, Castro said, "You know who we are," that she and her group were from the Playboys gang, and that she was going to kill Jenny if she did not give Castro money. When Jenny again refused, Castro punched her and then Vigueras, whom Castro had referred to as her husband, also punched Jenny. Castro suggests that the incident on the patio should not be considered because that threat to kill Jenny was not the basis of the criminal threat charge. Here, the parties' history includes the infliction of physical violence upon Jenny and the death threat on the patio. "'The parties' history can also be considered as one of the relevant circumstances.'" (*People v. Butler, supra*, 85 Cal.App.4th at p. 754.)

Castro was convicted of robbery for taking the phone, which she does not challenge. The use of force or fear to overcome resistance during or subsequent to seizure of the victim's property will support a charge of robbery. (See *People v. Hudson* (2017) 11 Cal.App.5th 831, 838-839.) Castro acknowledges that Jenny resisted by pushing Castro in an effort to retrieve her phone and that Castro pushed back, thwarting Jenny's efforts until Castro was able to give the phone to Vigueras and abscond. It is notable that Castro took the phone and overcame Jenny's resistance while standing in close proximity to Vigueras, the man whose punch had just injured Jenny. We cannot agree with Castro's conclusion that "[t]hese are not the actions of someone threatening death or great bodily injury."

34

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'""" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Considering all the circumstances, we conclude that the jury could and did reasonably find Castro's statement, "That's the last thing you're gonna do," sufficiently unequivocal, unconditional, immediate and specific to convey to Jenny a gravity of purpose and an immediate prospect of death or serious bodily injury. We therefore reject Castro's alternative interpretation.

Castro next contends that the evidence was insufficient to support a finding that Jenny experienced a state of sustained fear due to the threat. "Section 422 requires the person threatened 'reasonably to be in sustained fear for his or her own safety'" but "does not define 'sustained' fear." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) "Defining the word 'sustained' by its opposites, . . . means a period of time that extends beyond what is momentary, fleeting, or transitory." (*Ibid*.) That period of time can be as little as 15 to 30 minutes depending on the circumstances. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341; see *People v. Allen, supra*, at p. 1156 ["Fifteen minutes of fear of a defendant who is armed, mobile, and at large, and who has threatened to kill the victim and her daughter, is more than sufficient . . . ."].)

35

Jenny heard Castro's words as a death threat and tried to call the police after Castro left the bar, but was unable to get through. She worried that Castro and her group might harm her children, so Jenny quickly took a taxi home to check on them, then went to the police station to report the incident. Jenny moved to another residence because Pineda knew where she lived, and she was afraid they might hurt her or her children. Jenny testified that she was afraid and remained so at the time of trial. The threat was made on April 1, 2018, and Jenny gave her testimony on September 10, 2019. A rational jury surely could reasonably find that one year five months is a sufficient amount of time for her fear to have been sustained, and not just momentary, fleeting, or transitory.

Castro argues that if Jenny really feared for her life, she would not have resisted. Castro also claims that Jenny followed her "without hesitation" to the parking lot when Castro left the bar. "If she feared for her life, she would have called the police after appellant left the bar, not followed her to the parking lot." Castro misstates the facts. Jenny did not follow Castro to the parking lot. She testified that she followed her and her companions to the door, but she did not leave the bar. In addition, Jenny tried to call the police after they left with a borrowed phone, but the call would not go through.

Even if Castro's summary of the relevant facts is used, our task is still to determine whether substantial evidence supports the jury's finding, not whether substantial evidence supports a contrary finding. (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759.) As the circumstances justify the jury's finding that Jenny's fear was sustained and not just momentary, fleeting, or transitory, Castro has failed to show "'that upon no hypothesis

whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin, supra*, 18 Cal.4th at p. 331.) We thus reject her substantial evidence challenge.

### B. *Custody credits*

Castro contends that she is entitled to an additional seven days of presentence custody credit, noting she was given 606 actual days and 90 days of conduct credit on December 16, 2019, while the probation report gives her date of arrest as April 14, 2018. From the date of arrest through the date of sentencing is 612 actual days. With one additional day of conduct credit, Castro is entitled to a total of 703 days. (See §§ 2933.1, subds. (a), (c), 667.5, subd. (c)(9).) Respondent agrees. We correct the judgment accordingly.

## III. Pineda's appeal: claims of prosecutorial misconduct

Pineda contends that in rebuttal argument the prosecutor made irrelevant and prejudicial comments amounting to prosecutorial misconduct in violation of Pineda's rights to due process and a fair trial. In particular, he claims the prosecutor implied, without evidentiary support, that a witness refused to testify due to intimidation by the defendants, and that the prosecutor improperly appealed to the jurors' sympathy for the victims.

"We review the trial court's rulings on prosecutorial misconduct for abuse of discretion." (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793.) "'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

37

"Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.  [Citation.]  Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.  [Citation.]  To establish misconduct, defendant need not show that the prosecutor acted in bad faith . . . [citation] [but must] 'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.["]'" (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)

### A.    *Comments about absent witnesses*

During closing arguments, Castro's and Pineda's defense counsel noted the absence of witnesses to corroborate the victims' testimony.  Vigueras's counsel argued that the prosecutor was seeking guilty verdicts based completely on the testimony of noncredible victims but not other witnesses from the bar.  "What about the people who were there when this thing allegedly went down?  Wouldn't you want to hear from them?  Isn't that what you'd want to know before you decide something is proved beyond a reasonable doubt?"  Counsel suggested that because the prosecutor had the burden of proving guilt beyond a reasonable doubt, the prosecution, not defendants, was responsible for calling witnesses such as the bar manager, security guard, and others.  After counsel for Vigueras's argument, Pineda's attorney reminded the jury, "[W]e've talked about additional witness[es]," and told the jury, "Remember, Mr. Pineda does not have to provide any additional witnesses."

38

The prosecutor then rebutted without objection: "We're trying to figure out the truth of these charges, okay? Speculating about what so and so might have said if they were in court doesn't get us any closer to that. And it's not fair to our victims to punish them because there aren't other people that came to court." It is the next passage that Pineda challenges as misconduct:

"[L]ook, you can't speculate why people aren't in court. But how do you think that works? Do you think people normally want to come to court to testify against gang members? [¶] The manager—you want the manager to come to court when Detective Arnold goes into the bar and asks the manager what he saw, do you think he's gonna give a statement or cooperate and come to court?"

Vigueras's attorney objected to the last sentence without stating grounds and Castro's attorney stated, "It's prosecutorial misconduct." The trial court sustained the objection, adding, "Not the second one, the first one." The prosecutor went on to urge the jury not to speculate about any possible testimony from absent witnesses.

After the prosecutor's rebuttal and outside the presence of the jury, counsel for Vigueras argued that the prosecutor had implied that witnesses were not presented by the prosecution because they were afraid to come to court when in fact they had not even been interviewed or subpoenaed. Counsel suggested that the only cure for the misapprehension created would be for the prosecutor to stipulate that none of the people mentioned were interviewed, subpoenaed, or asked to come to court, and absent a stipulation, he would ask for a mistrial. Counsel for Pineda and Delgado joined. The prosecutor declined to give a

stipulation, but was open to a curative instruction.  He explained that it was not his intention to imply that absent witnesses were afraid to come to court but was instead directly responding to the arguments of defense counsel.

The trial court denied the motion for mistrial but agreed that the prosecutor's argument may have created an inference that the bar manager and other witnesses did not come forward because they were afraid.  The court gave the following instruction upon the jury's return to the courtroom:

> "[D]uring the prosecution's most recent argument, there was reference made to other witnesses possibly being afraid to come forward as a reason where you didn't hear from additional witnesses.  [¶]  And there was simply no evidence of that whatsoever.  And so it would be inappropriate for you to consider that inference, because there's just no evidence of it.  [¶] The evidence is what the evidence is.  And speculation about things like that are wholly inappropriate.  So you are directed not to engage in that kind of speculation and to not give credence to that portion of the argument that suggested it might be the case."

Pineda did not suggest or request any additional language for the admonition, and he does not claim on appeal that the court's admonition was error or that the court abused its discretion in finding no misconduct or denying the motion for mistrial.[13]  The trial court has "'considerable discretion' to

---

[13]    For the first time in his reply brief, Pineda asserts that the court's admonition should have informed the jury that the bar manager was never even subpoenaed by the prosecution and claims without citation to authority that because the prosecutor would not so stipulate, the only other remedy was a mistrial.

determine whether . . . the error can be cured through admonishment or instruction." (*People v. Perez* (2018) 4 Cal.5th 421, 459.) Instead of challenging the trial court's discretion, Pineda argues that the *prosecutor*'s errors in closing argument caused him prejudice, which requires reversal. Pineda's appeal is essentially taken from the alleged prosecutorial misconduct, not the court's rulings, which amounts to a suggestion that we should review the misconduct issue de novo. As that is not the standard of review and Pineda makes no effort to demonstrate that the court's ruling was arbitrary, capricious, or patently absurd, we decline Pineda's invitation.

We note the court instructed the jury that nothing the attorneys say in closing arguments is evidence and that neither side is required to call all witnesses who may have information about the case. Pineda draws on a comparison to *People v. Woods* (2006) 146 Cal.App.4th 106, 118, to support his assertion that the court's admonition and instruction did not cure the effect of the alleged misconduct. In *Woods*, the appellate court held that an instruction that argument is not evidence was ineffective because the prosecutor's arguments were rife with numerous serious misstatements of the evidence, and the trial court overruled the defendant's objections to them. (*Id*. at pp. 116-118.) There is no apt comparison between that case and this one. Here Pineda objected to just one sentence in the prosecutor's argument. The objectionable inference was a brief part of a longer argument

_____

Pineda did not request an admonition and has not challenged here the discretionary decision to deny a mistrial. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 704.) We do not address undeveloped claims or claims raised first in a reply brief. (*People v. Mickel* (2016) 2 Cal.5th 181, 197.)

urging jurors not to speculate regarding absent witness testimony, which Pineda does not challenge.  Also, unlike the *Woods* court, the trial court sustained the objection and read an admonition.  We presume that admonition cured any prejudice.  (See *People v. Dickey* (2005) 35 Cal.4th 884, 914.)  As Pineda points to no evidence to the contrary, we presume the jury followed its instructions.  (*People v. Mendoza, supra*, 42 Cal.4th at p. 699.)  We conclude that Pineda has failed to demonstrate that the trial court abused its discretion in finding no misconduct or in its implied finding that the curative instruction was adequate to dissipate any prejudice.

> ### B.    *Sympathy comment*

Pineda also assigns as prosecutorial misconduct the following statement in rebuttal: "You know, I feel bad for—we should all feel bad for Jenny that she had to have this happen to her and leave and not feel safe—"  Pineda's counsel objected on the ground that that the comments called for sympathy.  The trial court overruled the objection, and counsel did not ask that the jury be admonished to disregard the comment.

Pineda also challenges two statements the prosecution made some time after the objection was overruled.  The prosecutor told the jury that "Jenny and Yenis had to change jobs over what happened," and later that "[t]hese women are not in a good situation.  They don't make a lot of money.  They don't speak English."  Defendants did not object to these last two comments or request an admonition.

"[I]n order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it."  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339.)

42

"A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Peoples, supra*, 62 Cal.4th at p. 797.) Where a defendant offers no excuse or does not explain why an objection or admonishment would have been futile, he has forfeited the issue. (*Ibid*.)

Here, Pineda makes no attempt to explain the failure to request an admonishment after objecting to the first comment or his failure to object to the remaining comments. This issue has been forfeited. Furthermore, he has not shown prejudice. The trial court instructed the jury not to be influenced by sympathy, prejudice or bias for or against alleged victims, including bias based on gender, nationality, national origin, race or ethnicity, or socioeconomic status. The court also instructed the jury that nothing that the attorneys say in closing arguments is evidence. We presume the jury followed its instructions. (*People v. Mendoza, supra*, 42 Cal.4th at p. 699.)

## IV. Delgado's appeal[14]

### A. *Conflicting instructions*

Delgado contends that the trial court prejudicially erred by instructing the jury that extortion is a general intent crime. Instructional error is a question of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

Extortion is a specific intent crime (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 726), as it "requires an unlawful use of force or fear with the intent of achieving a further consequence,

---

[14] We discuss Delgado's claim of instructional error first, and then the substantial evidence challenge to the extortion conviction. The gang enhancement issues we resolve below in part VI regarding Assembly Bill 333.

the inducement of another person to consent to the actor's obtaining the other's property" (*People v. Hesslink* (1985) 167 Cal.App.3d 781, 789-790). The trial court read CALCRIM No. 252 in relevant part as follows:

> "The crimes . . . charged require proof of the union or joint operation of act and wrongful intent. [¶] The following crimes require general intent: Extortion, as charged in count 6, and felon in possession of a firearm, as charged in count 10. [¶] For you to find a person guilty of [this crime], that person must not only commit the prohibited act, but must do so with wrongful intent. [¶] A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime . . . . [¶] The following crimes . . . require a specific intent or mental state: attempted extortion, as charged in count 1 . . . . [¶] For you to find a person guilty of these crimes . . . , that person must not only intentionally commit the prohibited act, but must do so with a specific intent and mental state. The act and the specific intent and mental state required are explained in the instruction for that crime or allegation."

The People agree that giving CALCRIM No. 252 erroneously listed the specific intent crime of extortion as a general intent crime, but argue that the instructional error was harmless because CALCRIM No. 1830 correctly instructed the jury on the intent required for the crime of extortion.[15]

---

[15] The trial court read CALCRIM No. 1830 the elements of extortion, in relevant part as follows:

> "[D]efendants Delgado and Pineda are charged in count 6 with extortion by threat in violation of Penal

44

Relying on *People v. Lee* (1987) 43 Cal.3d 666, 669-675, Delgado contends that giving contradictory instructions regarding specific intent is similar to omitting the issue of specific intent altogether. In *Lee*, the defendant was charged with attempted murder. The trial court correctly instructed that a required element was intent to kill, but the court also gave instructions on implied malice, which does not require an intent to kill. (*Id*. at pp. 669-670.) The appellate court held: "[C]onflicting instructions, which appear to require a specific intent to kill but which eliminate that requirement where implied malice is found, are closely akin to instructions which completely remove the intent issue from the jury's consideration: If the implied malice instructions are followed, the issue of intent may indeed be removed from the case." (*Id*. at p. 674.) In such a case, conflicting instructions regarding intent may implicate due process and require a harmless error analysis under the of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), for federal constitutional error. (*Lee, supra*, at pp. 668-669, 676.) An error may be harmless under the *Chapman* test when "it appears 'beyond a reasonable doubt that the error complained of did not

---

Code section 518. [¶] Extortion requires the People to prove that: [¶] 1. The defendant threatened to unlawfully injure another person; [¶] 2. When making the threat, the defendant intended to use that fear to obtain the other person's consent to give the defendant money or property; [¶] 3. As a result of the threat, the other person consented to give the defendant money or property; and [¶] 4. As a result of the threat, the other person then gave the defendant money or property."

contribute to the verdict obtained.'" (*Neder v. United States* (1999) 527 U.S. 1, 15, quoting *Chapman, supra*, at p. 24.)

We do not agree that the instructional error here was akin to removing the intent element from the jury's consideration. The trial court instructed there must be a concurrence of act and wrongful intent, explaining that "to find a person guilty of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent," and that although the "person acts with wrongful intent when he or she intentionally does a prohibited act[,] . . . it is not required that he or she intend to break the law." That instruction is a generic instruction that applies to *both* general criminal intent and specific intent. (See *People v. Zerillo* (1950) 36 Cal.2d 222, 232; *People v. Hewitt* (1961) 198 Cal.App.2d 247, 251.) Thus, the remainder of CALCRIM No. 252, listing extortion as a general intent crime, did not negate specific intent. However, as such an instruction can cause confusion when specific intent is in issue, it should be qualified by adequate instructions on the requirement of specific intent. (*People v. Zerillo, supra*, at p. 232.) As the People point out, that was done here. The court instructed the jury that the act, intent and mental state required for a crime are explained in the instruction for that crime. CALCRIM No. 1830 lists the elements of extortion including the requirement that the prosecution prove that the defendant intended to use fear to obtain another person's consent to give him money or property. "'We presume jurors "generally understand and follow instructions."'" (*People v. Jackson* (2014) 58 Cal.4th 724, 767.)

The trial court did not instruct the jury that specific intent was *not* required or that intent could be implied and did not expressly define general criminal intent. As the court's definition

46

of general criminal intent was consistent with both general and specific intent and the court explained the specific intent requirement for extortion in CALCRIM No. 1830, we conclude that any conflict was resolved by the instructions and was thus not irreconcilable.  (See *Francis v. Franklin* (1985) 471 U.S. 307, 322.)

At most, the erroneous listing of extortion as a general intent crime created an ambiguity.  "If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4; see *People v. Rogers* (2006) 39 Cal.4th 826, 873.)  "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'"  (*People v. Smithey, supra*, at p. 963.)  We discern no reasonable likelihood that the erroneous part of CALCRIM No. 252 could have caused the jury to misunderstand the intent required for extortion in light the court's reference to the intent requirement in the instruction regarding the crime that adequately explained the intent required for extortion.

Moreover we discern no reasonable likelihood that the jury understood the instructions "in a way that prevent[ed] the consideration of constitutionally relevant evidence."  (*Boyde v. California* (1990) 494 U.S. 370, 380; see *People v. Jackson, supra*, 58 Cal.4th at pp. 766-767.)  However, even assuming the constitutional error Delgado posits, we would find it harmless under the *Chapman* test as "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Neder v. United States, supra*, 527 U.S. at

47

p. 15.)  In making this determination in the case of an omitted element, the erroneous instruction is properly found to be harmless if we can conclude "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." (*Id*. at p. 17.)

First, it was not Delgado's defense that he did not harbor the intent to use fear to obtain Yenis's consent to give him money. Instead it was the incident did not happen, that Yenis lied.  His counsel suggested that she had accused Delgado of asking for money only after she had problems with Pineda and broke up with him "in a bad way."  Counsel argued that text messages showed that Yenis and Delgado were friends, and it made no sense that a close or intimate friend "is just gonna say, hey, you gotta pay taxes."  Counsel also argued that there was no extortion and no threat because Delgado did not ask or demand money and never said he was going to do anything to her in relation to getting $100.  Counsel concluded that Yenis "flat-out lied."

Second, the evidence was overwhelming that Delgado demanded money with the intent to obtain Yenis's compliance by using her fear of losing her job.  Yenis was employed as a waitress at the Rodeo Room.  Delgado was at the bar every day until 2:00 a.m. to act, as he said, "something like security," although he was not an employee of the bar, and the bar actually employed a security guard.  Jenny testified that Delgado and Pineda were always at the bar together when she was there and they would leave together.  Delgado did not interact with the security guard or other bar staff.  Delgado would just stand by the door to the smoking patio, drinking water or cranberry juice,

48

looking around and sometimes going outside to talk to Pineda, who sold drugs in the patio. Thus, Delgado was not an employee of the bar, and his conduct implied that the security he provided was intended to support illegal activities there.

Delgado had told Yenis he was a member of the Playboys gang and had been in jail, and, because of that, she feared him. When Delgado demanded that she pay her quota, he called it "rent."[16] Delgado told Yenis that she had to pay rent because she was there, and she understood he meant payment for the right to work there, like a permit.

It is clear beyond a reasonable doubt the erroneous listing of extortion as a general intent crime did not contribute to the verdict obtained, and a rational jury would have found the Delgado guilty of extortion without the error. The error was thus harmless. (See *Neder v. United States, supra*, 527 U.S. at pp. 15, 17.)

### B. *Substantial evidence of extortion*

Delgado contends that substantial evidence does not support his conviction of extortion of Yenis (count 6).

As relevant here, "[e]xtortion is the obtaining of property or other consideration from another, with . . . her consent, . . . induced by a wrongful use of fear . . . ." (§ 518, subd. (a).) "Fear, such as will constitute extortion, may be induced by a threat of any of the following: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third

---

[16] Detective Arnold testified that he spent most of his 14 years as a police officer investigating gangs, including extortion cases involving gang members. He had spoken to "ficheras" and knew that "rent" and "taxing" were terms for protection money to be paid by workers to allow them to continue working.

person." (§ 519.) "The threat may be implied from all of the circumstances: "'No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [the defendant] and the [target of the threats] may be taken into consideration in making a determination of the question involved.""" (*People v. Bollaert, supra*, 248 Cal.App.4th at p. 725.)

"Property" must be given a sufficiently broad interpretation to advance the statutory purpose "by recognizing there are many real-world vulnerabilities an extortionist might exploit to induce a victim—including the victim's employment" such as "by threatening to end the victim's means of livelihood." (*Galeotti v. International Union of Operating Engineers Local No. 3* (2020) 48 Cal.App.5th 850, 859.)

Delgado suggests that there was no attempt to commit extortion because there was no *express* threat.[17] He asserts that Yenis testified that on March 6, 2018, Delgado "simply asked her for money as a 'rent' payment for working at the Rodeo Room" and that he "did not say he was going to do anything to her when he asked for the money." Delgado told Yenis that she *had* to give him some money because she was there and that everyone paid a

---

[17] Incorrectly paraphrasing a passage in *People v. Ochoa* (2016) 2 Cal.App.5th 1227, Delgado argues that "if there is no attempt to compel the victim to consent to give up money or property, there can be no extortion." The issue in *Ochoa* was *attempted* extortion. The court actually stated: "[I]f there is no attempt to compel the victim to consent to give up money or property, there can be no attempted extortion." (*Id.* at p. 1231.) Delgado does not challenge his attempted extortion of Jenny (count 1).

quota.  She understood his use of the word "rent" to mean money for the right to work there, like a permit.  Delgado's word implied a threat that she would not be permitted to work unless she paid him, which she did out of fear.  As we explained in part IV.A. above, the evidence was overwhelming that Delgado demanded money with the intent to obtain Yenis's compliance by using her fear of losing employment.

Delgado also argues that the circumstances did not demonstrate an implied threat because there was evidence that during the three days before and including March 6, but before he asked for "rent," Yenis sent friendly text messages to Delgado that were sometimes flirtatious or affectionate.  Delgado infers from the texts that Yenis was not afraid of him.  Delgado's argument appears to be that if Yenis was not afraid of Delgado *before* he implied he would interfere with her livelihood if she did not pay, she must not have been afraid afterward, and if she was not afraid after that, it must be inferred that he did not threaten her livelihood.  A conclusion such as Delgado's is no more than speculation and conjecture.  (See *People v. Massie* (2006) 142 Cal.App.4th 365, 374.)

In any event, there is no need here to *infer* fear or the absence of fear.  Yenis *testified* directly that she was afraid to say no to Delgado when he asked for rent.  Yenis also testified that she did not have Delgado's phone number and had not sent him a text message.  Instead, she identified multiple texts on her cell phone that she had sent to Pineda during the few days before March 6.  We do not reweigh the evidence or resolve conflicts within the evidence.  The testimony of a single witness is sufficient to support a conviction, so long as the testimony is not

51

physically impossible or inherently improbable. (*People v. Mayberry, supra*, 15 Cal.3d at p. 150.)

Delgado has made no attempt to show that Yenis's testimony is impossible or inherently improbable. Instead he cites exhibit H (68 unpaginated pages of screen shots of text messages and their translations), which was admitted into evidence with the stipulation that they were taken from Yenis's cell phone, the phone Pineda took from her when he and Delgado came to her home hours after he demanded rent. The phone was not turned over to investigators, and Detective Arnold testified that he first learned of its existence in court about a week before his testimony. He had not been able to download the contents for analysis. Given these circumstances, the jury was entitled to find Yenis's testimony more credible than exhibit H.

## V.  **Fines and fees**

All defendants contend that the trial court should have determined their ability to pay the amounts of fines and fees assessed at sentencing pursuant to section 1202.4, subdivision (b), section 1465.8, and Government Code section 70373.[18]  None of the defendants objected to the procedure or requested a hearing on their ability to pay at sentencing. Now all defendants claim that they had ineffective assistance of counsel on this issue.

Defendants rely primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), where Division Seven of this court held that principles of due process and equal protection required reading into Government Code section 70373 and Penal Code section 1465.8 a procedure for obtaining a waiver of the assessments on the ground of inability to pay. (*Dueñas, supra*, at

---

[18]  Each defendant's total obligation was under $600.

52

pp. 1164-1167.) The court also held that due process required a consideration of the defendant's inability to pay even when only the minimum fine is imposed. (*Id*. at p. 1172 & fn. 10.) The *Dueñas* court relied on United States Supreme Court and California Supreme Court decisions, which have held that constitutional equal protection and due process guarantees prohibit states from denying indigent criminal defendants *access* to the courts or *punishing* them solely on the basis of their poverty. (*Id*. at pp. 1166-1168, citing *Bearden v. Georgia* (1983) 461 U.S. 660, *Tate v. Short* (1971) 401 U.S. 395, *Griffin v. Illinois* (1956) 351 U.S. 12 & *In re Antazo* (1970) 3 Cal.3d 100.) From these two concepts the *Dueñas* court explained in a subsequent opinion that its holding created the "newly announced constitutional principle" that "it was unconstitutional to impose fines, fees or assessments without a [prior] determination of the defendant's ability to pay." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489.)[19]

In general, a failure to object to fines, fees, and assessments in the trial court based on an inability to pay, forfeits the right to challenge them on appeal. (See *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Avila* (2009) 46 Cal.4th 680, 729.) More to the point, the failure to object or to request a determination of ability to pay forfeits a *Dueñas* issue on appeal. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624.)

---

[19] Currently pending before the California Supreme Court is *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844, to consider whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments. If so, who bears the burden of proof regarding a defendant's inability to pay?

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-687; see Cal. Const., art. I, § 15.)  To make out a claim that counsel rendered constitutionally ineffective assistance, one must show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  Second, resulting prejudice must be shown.  A defendant must show the record discloses counsel had no rational tactical purpose for the challenged act or omission, that counsel was asked for a reason and failed to provide one, or there could be no satisfactory explanation. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

None of the defendants asserts their counsel was asked their reasons for not objecting or requesting a hearing.  Castro argues there can be no satisfactory explanation for counsel's failure to object because an objection would only have helped her. Vigueras does not argue that there can be no satisfactory explanation.  Delgado argues there can be no satisfactory explanation because the probation report notes that he was unemployed.  Pineda argues there can be no satisfactory explanation because there *is* no reasonable explanation for not objecting to the imposition of fines and fees.  Defendants' conclusory arguments fail to show there could not be a satisfactory explanation.  The People aptly note there is nothing in the record that reveals counsel's reasons and that a possible reasonable explanation is counsel might have known their clients' financial conditions, and the evidence would not show an inability to pay the fines and fees.  As defendants have failed to both preserve this issue for review and to show that it can be

54

resolved on the trial record, their ineffective assistance of counsel claims fail.

Regardless, even if defendants had not forfeited the *Dueñas* claim, we would reject it as meritless. We have previously disagreed with *Dueñas*'s analysis and have concluded it was wrongly decided. In particular, we disagree with *Dueñas* that due process demands an ability to pay finding *prior* to the imposition of fines or fees. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 326-329, review granted Nov. 26, 2019, S258946.) In order to demonstrate a due process violation, a defendant must show that the "'imposition of these financial obligations . . . denied defendant access to the courts' [or] '. . . result[ed] in defendant's incarceration.'" (*People v. Petri* (2020) 45 Cal.App.5th 82, 92, quoting *People v. Hicks, supra*, at p. 329; see *People v. Caceres* (2019) 39 Cal.App.5th 917, 922-923, 928-929.) As defendants do not claim that they have been denied access to the courts or are presently faced with incarceration or other impending consequence due to a failure to pay amounts due, their due process claims fail.[20]

---

[20] Pineda also suggests that he has a claim under the Eighth Amendment, citing *Timbs v. Indiana* (2019) ___ U.S. ___, [139 S.Ct. 682], in which the United States Supreme Court declined to overrule precedent holding that the the Fourteenth Amendment incorporates the excessive fines clause and applies to civil in rem forfeitures that are at least partially punitive. (*Id*. at p. ___ [139 S.Ct. at pp. 689-690].) Pineda did not raise this issue below and makes no effort to show how that case applies here. We therefore find this claim is also forfeited and without merit.

## VI. Assembly Bill 333
### A. *Section 186.22*

Gang enhancements were imposed pursuant to section 186.22, former subdivision (b) as follows: count 1, as to Vigueras; counts 1, 2, 4 and 5, as to Castro; and counts 1, 2, 6 and 7, as to Delgado. Effective January 1, 2022, Assembly Bill 333 amended section 186.22. (Stats. 2021, ch. 699, § 3.) All three defendants seek reversal of the enhancements due to the amended statute.

The People concede the amendments apply retroactively to defendants. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) Under the rule articulated in *In re Estrada* (1965) 63 Cal.2d 740, 744-746 (*Estrada*), "absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date." (*Lopez*, at pp. 344-345.) The People further concede that remand is required due to the insufficiency of the evidence supporting the gang enhancements under the terms of the amended section 186.22.

As amended, section 186.22, subdivision (b)(1) now applies to a conviction of "a felony committed for the benefit of, at the direction of, or in association with a criminal street gang," instead of "*any* criminal street gang" as the former statute provided. Section 186.22, subdivision (f) has redefined "criminal street gang" as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal

56

gang activity." (Italics added.) Thus the prosecution must now prove collective, not merely individual, engagement in a pattern of criminal gang activity.

A "pattern of criminal gang activity" now means the commission, attempted commission, or conviction of two or more offenses enumerated in section 186.22, subdivision (e)(1), "provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) "The currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).)

Evidence of two offenses committed by Playboys gang members was presented at defendants' trial to establish a pattern of criminal gang activity. These predicate offenses were enumerated in section 186.22, subdivision (e)(1)(A) (assault by means of force likely to produce great bodily injury) and (R) (attempted extortion). Both crimes were of the kind that were among the Playboys gang's primary activities, were committed within three years of each other, and were committed within three years of the currently charged offense. However, no evidence was introduced at trial to establish that the predicate

57

crimes were committed collectively, that the predicate offenses commonly benefitted a criminal street gang, or that the benefit was more than reputational. Indeed, as the People note, the jury was told that the predicate "crimes themselves don't have necessarily to be gang related." Further, the prosecutor told the jury that if it found that three defendants were members of the gang and that they committed crimes, those findings could factor into the jury's finding a pattern of activity to establish that the Playboys gang was a criminal street gang.

In sum, the evidence was insufficient under section 186.22 as amended by Assembly Bill 333 to establish a pattern of criminal gang activity. The gang enhancements must therefore be vacated, and the matter will be remanded to give the prosecution the opportunity to prove the allegations under the amendments to section 186.22. (See *People v. Lopez, supra*, 73 Cal.App.5th at p. 346.)

### B. *Retroactivity of section 1109*

Assembly Bill 333 also enacted section 1109, which allows the section 186.22, subdivision (b) or (d) gang enhancement to be tried separately from guilt. (§ 1109, subd. (a).) Vigueras and Castro contend section 1109 should be applied retroactively to afford them a new trial, bifurcated from the gang enhancement should the People choose to retry the enhancement.

There is no language contained in section 1109 declaring it to be retroactive. "No part of the Penal Code 'is retroactive, unless expressly so declared.' (§ 3.) '[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must

58

have intended a retroactive application." [Citations.] Accordingly, "'a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.'"'" (*People v. Buycks, supra*, 5 Cal.5th at p. 880.) However, a "limited rule of retroactivity" (the *Estrada* rule) applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment or possible criminal punishment for certain crimes or a class of offenders. (*Buycks*, at p. 881, citing *Estrada, supra*, 63 Cal.2d at p. 745; *Buycks*, at p. 883, fn. 8, citing *People v. Superior Cour*t (*Lara*) (2018) 4 Cal.5th 299, 308 (*Lara*).)

In supplemental briefs Vigueras and Castro contend section 1109 applies retroactively to afford them a new trial on the issue of guilt, arguing that the California Supreme Court has extended the *Estrada* rule to apply not only to statutory amendments that reduce punishment but to all amendments that might provide any "ameliorative benefit" to criminal defendants.

To support this contention, Castro relies on *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274100 (*Burgos*), in which the majority held "the California Supreme Court has clarified the scope of the *Estrada* rule, expressly holding that a new statute may apply retroactively even if it concerns purely procedural changes that do not directly reduce the punishment for a crime." (*Id*. at p. 565.) The court found an indirect relationship to punishment in section 1109, in that without the prejudicial impact of gang evidence, some defendants might be acquitted of the underlying offense, thereby eliminating any possible punishment. (*Burgos*, at p. 567.) The court pointed to *People v. Wright* (2006) 40 Cal.4th 81, which applied *Estrada* to a new law that created an affirmative defense,

59

and to *Lara, supra*, 4 Cal.5th at pages 307-308, in which the California Supreme Court held that Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016)) applied retroactively, because it required criminal cases against minors to be filed first in juvenile court with a greater possibility of more lenient treatment than in adult court. The *Burgos* court also relied on *People v. Frahs* (2020) 9 Cal.5th 618, 629 (*Frahs*), where the statute at issue provided the possibility of diversion in lieu of punishment. (*Burgos, supra*, at p. 565.)

None of the three cases cited in *Burgos* held that absent evidence of legislative intent, retroactivity is extended to any possible benefit that might be considered ameliorative of some aspect of criminal procedure unrelated to punishment or an affirmative defense. As Justice Elia pointed out in his dissent in *Burgos*, neither *Estrada*, *Frahs*, *Lara*, nor "any other [authority] has ever applied the *Estrada* rule to a statute, like section 1109, that does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or a defense. Section 1109, unlike all of the amendatory statutes to which the *Estrada* rule has been applied, is a prophylactic rule of criminal procedure expressly intended to employ new procedures aimed at enhancing the fairness of future criminal proceedings." (*Burgos, supra*, 77 Cal.App.5th at p. 572 (dis. opn. of Elia, J.), review granted.)

The People cite *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted August 17, 2022, S275090, which pointed out that "[u]nlike the new law in *Lara*, [*supra,* 4 Cal.5th 299], which was a new procedural law that had the effect of potentially reducing the punishment for a class of defendants, . . . section 1109 is a procedural statute that ensures a jury will not be

60

prejudiced by the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed." We agree with the *Perez* court that "[a]lthough section 1109 is designed to minimize the prejudicial impact of gang evidence, it does not reduce the punishment or narrow the scope of the application of the gang statute [and thus] does not apply retroactively to a trial that has already occurred." (*Ibid.*)

Moreover, even if section 1109 were retroactive, we would not order a new trial unless it is reasonably probable that a bifurcated trial would have produced a more favorable result. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.) We conclude that it is not reasonably probable, as much of the gang evidence would be admissible and highly probative in any retrial. "In cases not involving the gang enhancement, . . . evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) However, "[t]he People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Gang evidence, "'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like[,] can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*Ibid.*, quoting *People v. Hernandez, supra*, at p. 1049.) Here, force or fear is an element of several of the charges against defendants. To prove extortion the prosecution would be required to present evidence that defendant wrongfully used fear. (§ 518, subd. (a).) To prove criminal threat, there must be evidence that the threat caused

61

the victim to be in sustained fear.  (§ 422, subd. (a).)  Proof of robbery must include evidence that the crime was accomplished by means of force or fear.  (§ 211.)

In addition, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and . . . [a]n explanation of the basis for the witness's fear is likewise relevant to her credibility . . . ."  (*People v. Burgener* (2003) 29 Cal.4th 833, 869, citations omitted.)  The credibility of Jenny and Yenis was under attack at trial.  During closing arguments, Castro's and Pineda's counsel noted the absence of witnesses corroborating the victims' testimony.  Vigueras's counsel argued that the prosecutor was seeking guilty verdicts based completely on the testimony of victims who were not credible, even though there were other witnesses in the bar.  Pineda's counsel argued: "[W]hen you look at what's really going on in this case, and who is making up stories, and Yenis is the one that' s doing it"; and, "[T]hese are not all of them.  But in going through the evidence, I put 'the changes, the stories, the lies, the impeachment all by Yenis.'"

Gang evidence was highly probative of the victims' fear and the means and methods used by defendants to instill fear.  Delgado told Jenny that his tattoos represented the Playboys gang, which caused Jenny some fear.  It can reasonably be inferred that Jenny knew Vigueras and Castro were gang members, as both defendants have Playboys-related tattoos and were acquainted with Delgado.  In addition, when Castro demanded money from Jenny, she told Jenny that she and her group were from the Playboys gang, saying, "You know who we are," and that Castro was going to kill Jenny if Jenny did not give money.  Castro and Vigueras then hit Jenny, followed her inside,

where Castro again threatened her and took her phone. Jenny was so fearful they could come back and hurt her or her children, that she moved.

Delgado told Yenis that everyone there was paying a quota, and she had to give him money for "rent." She understood that he meant that she was required to pay him to work at the Rodeo Room because the Playboys gang was in charge of the place. Yenis also knew that Pineda and Delgado were members of the gang. She was afraid not to pay because she knew that "[t]hey were the ones bossing around there."

We conclude that in a retrial without the gang enhancements, gang evidence would continue to be compelling proof of the fear experienced by Jenny and Yenis, their credibility, as well as defendants' motives, methods, and means of applying force or fear. It is thus not reasonably probable that a bifurcated trial would yield a better result for defendants and remand for retrial on the charges is unwarranted. (See *People v. E.H., supra*, 75 Cal.App.5th at p. 480.)

## DISPOSITION

Castro's judgment is amended to add an additional seven days of presentence custody credit, consisting of six additional actual days and one additional day of conduct credit, for a total of 703 days. The trial court is directed to prepare an amended abstract of judgment reflecting the modified presentence custody credit and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

The true findings as to the enhancement allegations under section 186.22, former subdivision (b) are reversed, and the sentences of Vigueras, Castro, and Delgado are vacated to permit

63

retrial of the gang-related enhancement allegations should the People so elect and to permit the court to comply with section 1170, subdivision (b). If the People prove the gang-related allegations pursuant to the requirements of section 186.22, the sentences of Castro and Delgado shall be reinstated, and the sentence of Vigueras will be reinstated if the court also complies with section 1170, subdivision (b). Otherwise, the court is directed to resentence Castro, Vigueras, and Delgado in accordance with the views expressed in this opinion.

In all other respects, the judgments are affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.

64